USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/28/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

KAREN E. DILLON,

                               Plaintiff,

       -against-

METROPOLITAN LIFE INSURANCE
COMPANY

                             Defendant.

------------------------------------------------------------x

09 Civ. 7958 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

The issue for resolution is whether plaintiff Karen E. Dillon is entitled to recover $837,000 from each of two different life insurance policies issued by defendant Metropolitan Life Insurance Company ("MetLife") to plaintiff's late husband Jack Dillon. MetLife has now moved for summary judgment in its favor. Because Mr. Dillon's group life insurance policy is governed by ERISA and the plan administrator was correct in determining that the group plan did not allow a participant to hold both a group policy and a conversion policy at the same time, MetLife's motion for summary judgment is granted.

I.     BACKGROUND

Unless otherwise noted, the following facts are not in dispute.

    A.     The Parties

Karen Dillon is the widow of Jack Dillon, a former employee of non-party Parker Hannifin Corporation. (Compl. ¶¶ 1, 4.) Mrs. Dillon is the legal representative of her late husband's estate. (*Id.* ¶ 1.) MetLife issued group term life insurance to eligible employees at Parker Hannifin. (*Id.* ¶¶ 2, 5.)

1

B.  Mr. Dillon's Group Life Insurance Policy

Parker Hannifin sponsored an employee benefit plan (the "Plan") regulated by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"). (Def.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Def.'s 56.1") ¶ 1.); (Pl.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1") ¶ 1.) MetLife administered any claims under that plan in accordance with ERISA and the documents and instruments governing the Plan. (Def.'s 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.) Mr. Dillon, as an employee of Parker Hannifin, was enrolled for life insurance benefits pursuant to the Plan. (Def.'s 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) Mrs. Dillon was the primary beneficiary of Mr. Dillon's group policy. (Compl. ¶ 6.)

The terms of Mr. Dillon's life insurance benefits were set forth in Parker Hannifin's Employee Benefit Plan (*See* Def.'s 56.1 ¶¶ 4-5; Pl.'s 56.1 ¶¶ 4-5.) The group plan specified that "[a]ll of your benefits will end on the date your employment ends." (Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4; Group Plan, Ex. A to Decl. of Patricia C. Reinhardt dated Feb 4, 2010 at 81.) Employment ends when participants "cease Active Work as an Employee." (Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.) However, when participants become sick or take a leave of absence from work, Parker Hannifin may deem them "to be in Active Work as an Employee only for the purpose of continuing [their] employment . . . in order that certain of [their] benefits under This Plan may be continued." (Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.) Participants' benefits end on either (1) the date Parker Hannifin instructs MetLife to discontinue their benefits or (2) the last date for which Parker Hannifin has paid premiums to MetLife for their benefits. (Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 4.)

The group plan provides an option for participants to convert their group coverage to an individual policy when their employment ends. Specifically, MetLife will issue an individual policy to participants if they apply for it in writing during the application period (Def.'s 56.1 ¶ 5;

2

Pl.'s 56.1 ¶ 5), which, as relevant here, is the thirty-one day period after the date a participant's "Life Benefits end because [his or her] employment ends." (Def.'s 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.) The individual policy does not take effect until after the application period ends. (Def.'s 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.)

The 2008 Parker Hannifin Summary Plan Description (the "SPD"), which is consistent with the terms of the group plan, states that if participants become "disabled"—meaning unable to perform the material duties of their regular job—their Basic Life Insurance coverage continues for twelve months from the onset of disability. (Def.'s 56.1 ¶ 6; Pl.'s 56.1 ¶ 6.) After their extended coverage ends, participants may convert their basic life insurance to an individual policy. (Def.'s 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.) In a section titled "Converting your Coverage," the SPD states that participants "may convert all or part of [their] Basic Life Insurance to an individual policy at rates set by MetLife if [their] insurance ends because" they "[e]nd active employment (or [their] extended coverage while on long-term disability ends)." (Def.'s 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.) Parker Hannifin's practice was to treat basic and optional life insurance benefits in the same manner with respect to eligibility issues. (Def.'s 56.1 ¶ 8.)[1]

### C. Parker Hannifin Terminates Mr. Dillon's Employment

In early 2008, Mr. Dillon was diagnosed with cancer. (Compl. ¶ 7.) As a result, he was unable to continue working and on March 24, 2008, Parker Hannifin placed him on a medical leave of absence. (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.) Contrary to the terms of the Plan and Parker Hannifin's employment practices, Jack Dillon's group basic and optional life insurance benefits

---

[1] Plaintiff denies this statement, alleging that it is "unsupported by a citation to admissible evidence as required by Local Rule 56.1(d)." (Pl.'s 56.1 ¶ 8.) However, plaintiff fails to explain why the evidence that defendant has cited—the sworn affidavit of Marian Brown, a Benefits Service Center Specialist with Parker Hannifin—would be inadmissible nor does she cite any evidence contradicting paragraph eight of defendant's 56.1 statement. Because Brown's statement would be admissible evidence, the Court deems paragraph eight of defendant's 56.1 statement to be admitted.

3

"were mistakenly terminated" on or around September 24, 2008. (Def.'s 56.1 ¶ 11; Pl.'s 56.1 ¶ 11.)

### D. The Conversion Policy and Reinstatement of the Group Policy

Approximately two weeks later, on October 8, 2008, Parker Hannifin contacted MetLife to inquire about whether Mr. Dillon could convert his group basic and optional life insurance benefits to an individual policy. (Def.'s 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.) Two days later, Parker Hannifin sent a group conversion form to Mrs. Dillon. (Def.'s 56.1 ¶ 13; Pl.'s 56.1 ¶ 13; Group Conversion Notice Form, Ex. F to Reinhardt Decl.) The Dillons completed a group conversion application on October 13, 2008. (Def.'s 56.1 ¶ 14; Pl.'s 56.1 ¶ 14.) The face amount of the conversion application was $837,000, the same amount of coverage Mr. Dillon had had pursuant to his group policy. (*See* Exs. F and G to Reinhardt Decl.) On October 28, 2008, MetLife issued an individual policy to Mr. Dillon (the "conversion policy"). (Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) He passed away three days later. (Def.'s 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.)

Within days of Mr. Dillon's death, Parker Hannifin realized that it should not have terminated Mr. Dillon's group benefits and instructed MetLife to reinstate his group policy, which MetLife did.[2] On October 30, 2008, MetLife determined that Mrs. Dillon was not eligible for benefits under *both* the group policy and the conversion policy. (Def.'s 56.1 ¶ 21; Pl.'s 56.1 ¶ 21.) On November 4, 2008, MetLife sent a letter to plaintiff stating that Parker Hannifin had advised MetLife that the conversion policy had been "issued in error and that [Mr. Dillon] remained covered under his group policy." (Ex. L to Reinhardt Decl.) In the same letter,

---

[2] The parties dispute the exact date that Parker Hannifin directed MetLife to reinstate the group policy. MetLife asserts that Parker Hannifin ordered the reinstatement on October 27, 2008. (Def.'s 56.1 ¶ 18.) Plaintiff does not offer a clear date on which the benefits were reinstated. (Pl.'s 56.1 ¶ 18.) In any event, sometime after their cancellation, Mr. Dillon's group benefits were reinstated. Both parties admit that at least as of January 16, 2009, Mr. Dillon's group life insurance "was not cancelled." (Def.'s 56.1 ¶ 27; Pl.'s 56.1 ¶ 27.)

4

MetLife wrote that "we have rescinded" the conversion policy and have "enclosed a check for all premiums paid on [that policy], plus interest, from the date of issue, totaling $2393.44." (Ex. L to Reinhardt Decl.)

Plaintiff filed claims with MetLife pursuant to both the reinstated group policy and the conversion policy. (Def.'s 56.1 ¶ 25, 26; Pl.'s 56.1 ¶ 25, 26.) On January 16, 2009, MetLife paid plaintiff $840,503.20, the coverage due under the group policy for group basic and optional life benefits, plus applicable interest. (Def.'s 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.) MetLife has, however, refused to pay Mrs. Dillon pursuant to the conversion policy. (*See* Ex. L to Reinhardt Decl.)

### E.   This Action

On August 27, 2009, Plaintiff commenced this action in New York Supreme Court, New York County for breach of contract and a declaratory judgment that MetLife had breached its obligations under the conversion policy and owed plaintiff an additional $837,000 on top of the $840,503.20 it has already paid her. (*See* Compl. ¶¶ 22-33; Notice of Removal dated Sept. 15, 2009, at 1.)

MetLife removed this action to this Court contending that the complaint seeks benefits pursuant to a policy governed by ERISA and therefore falls within this Court's federal question jurisdiction. *See* 28 U.S.C. § 1441(a). Dillon moved to remand the case to New York Supreme Court on the grounds that her claims were governed by state law. This Court denied that motion, holding that plaintiff's claims turn on the "conversion privilege" contained in an ERISA-covered group plan and therefore raise a federal question. *See Dillon v. Metro. Life Ins. Co.*, 718 F. Supp. 2d 321, 326 (S.D.N.Y. 2010). Following discovery proceedings, MetLife has now moved for summary judgment.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only if the evidence shows that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). Nonetheless, the party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual assertions. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

### B. Plaintiff's Claim is Governed by ERISA

ERISA "applies to employee benefit plans, not employee benefits." *Howard v. Gleason Corp.*, 901 F.2d 1154, 1156 (2d Cir. 1990) (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 7 (1987)). The Court must therefore address whether this action concerns the *right to convert* Dillon's group life policy—which all parties agree is governed by ERISA (Def.'s 56.1 ¶ 1; Pl.'s 56.1 ¶ 1)—into a separate conversion policy or whether it concerns *benefits under a conversion policy*. This Court has previously held that this action falls into the former category. *See Dillon v. Metro. Life Ins. Co.*, 718 F. Supp. 2d 321, 326 (S.D.N.Y. 2010). In that opinion, the Court concluded that "the core of the dispute in this action stems not from the converted policy but instead from the process of conversion and the consequences of that process." *Id.* The plaintiff's claim is therefore governed by ERISA. *See Howard*, 901 F.2d at 1157-58 (finding that claims arising from an employee's right to convert a group insurance policy are governed by ERISA).

### C. Plaintiff's State Law Breach of Contract Claim is Completely Preempted by ERISA

#### a. *The Claim is Preempted*

ERISA creates a comprehensive civil enforcement scheme that completely preempts "any state-law cause of action that duplicates, supplements, or supplants" an ERISA remedy. *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 327 (2d Cir. 2011) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004)). The ERISA civil enforcement scheme is set forth in section 502(a) of the statute, and provides, *inter alia*, that a plan participant or beneficiary may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" ERISA § 502(a)(1)(B), 29 U.S.C. §1132(a)(1)(B). If plaintiff's claim falls within the scope of section 502(a)(1)(B), the claim is preempted by ERISA. *Montefiore*, 642 F.3d at 328.

The U.S. Supreme Court has set forth a two-part test to determine whether a claim falls within the civil enforcement provision of ERISA. "[C]laims are completely preempted by ERISA if they are brought (i) by 'an individual [who] at some point in time, could have brought his claim under ERISA § 502(a)(1)(B),' and (ii) under circumstances in which 'there is no other independent legal duty that is implicated by a defendant's actions.'" *Montefiore*, 642 F.3d at 328. (quoting *Davila*, 542 U.S. at 210).

Plaintiff's claim meets the first requirement for preemption. Dillon was eligible to bring a claim under ERISA because he was "a participant or beneficiary" of an ERISA plan. *See* 29 U.S.C. § 1132(a)(1)(B). Although Dillon brings his claim as a garden variety breach of contract claim, he could have brought it as a claim for benefits under ERISA because it is grounded in the denial of benefits pursuant to the terms of his Plan. *See Montefiore*, 642 F.3d at 331 (finding that

7

plaintiff had a colorable claim for benefits pursuant to ERISA section 502(a)(1)(B) because the relevant claims "implicate[d] coverage determinations under the relevant terms of the Plan").

Plaintiff's claim meets the second requirement for preemption because there is no other independent legal duty implicated by defendant's actions. Dillon's state law breach of contract claim derives entirely from MetLife's obligations pursuant to the Plan. Any evaluation of the claim is "inextricably intertwined with the interpretation of Plan coverage and benefits." *Montefiore*, 642 F.3d at 332.

Since both prongs of the test under *Montefiore* are met, the Court concludes that plaintiff's claim is completely preempted by ERISA. The Court must now decide whether to recharacterize the breach of contract claim as a claim pursuant to ERISA section 502(a)(1)(B) or to dismiss the claim without prejudice. *See Harrison v. Metro. Life Ins. Co.*, 417 F. Supp. 2d 424, 434 (S.D.N.Y. 2006). While federal courts have disagreed as to which approach is preferable, *see e.g., Fanney v. Trigon Ins. Co.*, 11 F. Supp. 2d 829, 832 (E.D. Va. 1998), at least two courts in this district have concluded that "where a complaint characterizes a claim as a common law breach of contract, but sets forth the elements of a claim under ERISA § 502(a)(1), the court's proper course is to recharacterize the claim as a claim under ERISA § 502(a)(1(B) rather than to dismiss the complaint under the preemption doctrine." *Harrison*, 417 F. Supp. 2d at 434; *see also Arthurs v. Metro. Life. Ins. Co.*, 760 F. Supp. 1095, 1098 (S.D.N.Y. 1991). The *Harrison* court reasoned that recharacterizing the claim as an ERISA claim is "consistent with the Second Circuit's holding that a pleading is sufficient where it sets forth the factual allegations supporting the elements of a claim, even if it fails to identify the specific law under which it brings a claim." *Harrison*, 417 F. Supp. 2d at 434 (citing *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 712 n.4 (2d Cir. 1980)).

The Court agrees with this reasoning, and determines that plaintiff has set forth the elements of a claim pursuant to ERISA section 502(a)(1). To prevail under this ERISA provision, the plaintiff must show that "(1) the plan is covered by ERISA;[3] (2) the plaintiff is a participant or beneficiary of the plan; and (3) the plaintiff was wrongfully denied a benefit owed under the plan." *Guerrero v. FJC Sec. Servs.*, 423 Fed. Appx. 14, 16 (2d Cir. 2011) (citing *Giordano v. Thomson*, 564 F.3d 163, 168 (2d Cir. 2009)). As plaintiff has alleged these elements, the Court will treat the breach of contract claim as a claim pursuant to section 502(a)(1)(B).

b.   *Standard of Review of ERISA Plan Administrator's Decision*

"A denial of benefits challenged under [section 502(a)(1)(B)] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where, as here,[4] a plan grants a plan administrator discretionary authority to make such determinations, "a decision will not be

---

[3] This element is not specifically alleged in the Complaint, but is admitted in Plaintiff's Local Civil Rule 56.1 Statement ¶ 1.

[4] The Group Plan states that:

> [T]he Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Group Plan, Ex. A to Reinhardt Decl. at 88.)

The parties do not dispute that the Plan gives discretionary authority to MetLife or that the Court should review MetLife's decision under the arbitrary and capricious standard. (*See* Pl's Mem. of Law in Opp. to Mot. for Summ. J. at 7-8; Def.'s Mem of Law in Support of Mot. for Summ. J. at 4-5.)

overturned unless it was arbitrary and capricious or erroneous as a matter of law." *Harrison*, 417 F. Supp. 2d 424 at 435 (citing *Firestone*, 489 U.S. at 115).

Under the arbitrary and capricious standard of review, a court may overturn an administrator's decision to deny ERISA benefits "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision-maker and] requires more than a scintilla but less than a preponderance." *Armstrong v. Liberty Mut. Life Assur. Co. of Boston*, 273 F. Supp. 2d 395, 404 (S.D.N.Y.2003) (internal quotations and citation omitted). A court's review is limited to the administrative record or the evidence before the claims fiduciary when it considered plaintiff's request for benefits." *See Miller v. United Welfare Fund*, 72 F. 3d 1066, 1071 (2d Cir. 1995). If, upon review, a court concludes that the administrator's decision was arbitrary and capricious, it must remand to the administrator "to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a useless formality." *Id.* (internal quotation marks omitted).

        c.    *MetLife's Decision to Deny Benefits Was Arbitrary and Capricious*

MetLife asserts that Katherine Callaghan, Senior Manager of Group Life Products for MetLife, reasonably concluded that plaintiff should receive benefits under the group policy, but not under the conversion policy, because her decision was consistent with the terms of the Plan. However, simply because Callaghan's decision was consistent with the group plan does not mean that the decision was supported by substantial evidence. "In reviewing the administrator's decision deferentially, a district court must consider whether the decision was based on a

10

consideration of the relevant factors." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotation marks omitted). The most relevant factor in determining whether plaintiff was entitled to benefits under both the group policy and the conversion policy is the language of the group plan and the terms of its conversion privilege.

The Court finds that MetLife's denial of benefits under the conversion policy—and the subsequent denial of benefits under that policy—was arbitrary and capricious. MetLife does not identify the documents that comprise the "administrative record," but cites two exhibits in support of its assertion that Callaghan's decision was reasonable. These exhibits, which consist of a string of e-mails between Callaghan and other MetLife employees and Callaghan's deposition testimony regarding those same emails (Ex. K to Reinhardt Dec. at 524-26; Ex. W to Reinhardt Decl. at 45;8-19), do not establish an evidentiary basis for MetLife's decision to rescind the conversion policy. Indeed, they do not address whatsoever the basis for Callaghan's decision. To the extent that these two exhibits constitute the entirety of the administrative record, they do not show that MetLife's decision was supported by substantial evidence.

Moreover, Callaghan's deposition testimony shows that her decision to deny plaintiff benefits under the conversion policy was not well-informed. She was the sole person responsible for the decision to rescind the conversion policy and to deny benefits under that policy, yet the *only* information she had before making this decision was that Mr. Dillon had converted his group insurance to an individual policy and that Parker Hannifin "had reinstated Mr. Dillon's group life insurance." (Deposition of Katherine Callaghan dated Nov. 19, 2010 at 18:15-19:9, 73:5-7, Ex. A to Decl. of Frank S. Occhipinti dated Mar. 1, 2011.) Callaghan did not know anything about the group policy itself, apart from its name (*id.* at 19:10-13), nor did she review any of the terms and provisions in the group plan (*id.* at 20:22-21:20). Because Callaghan was

11

wholly uninformed about the group policy and the group plan, her decision to deny benefits under the conversion policy was not supported by substantial evidence. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (finding that administrator's reliance on "limited information" to deny claim was arbitrary and capricious since it was not " based on a consideration of the relevant factors"). Because MetLife's decision to rescind the conversion policy and to deny benefits under the conversion policy was not based on substantial evidence, the decision was arbitrary and capricious.

The normal procedure for review of ERISA denials that have been found arbitrary and capricious is to remand to the fiduciary for a new eligibility determination. However, in this instance, the factual record does not need to be further developed in order for MetLife to make a proper determination. *See Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 630 ("[N]ow that the relevant information has been finally disclosed, we are confident that administrative remand would be futile."). All of the pertinent documents and relevant information—namely the group policy, the group plan, and the SPD—have been disclosed. Moreover, MetLife's eligibility and benefit determination, even if unsupported by substantial evidence in the administrative record, was, as a substantive matter, an appropriate interpretation of the group plan. *See Krauss,* 517 F.3d 614, 630 (2d Cir. 2008) (finding that the administrator's benefits determination, "even if not properly explained at the time of denial and during administrative review, was, as a substantive matter, an appropriate implementation of the [relevant policy] under the Plan"). The Court thus concludes that administrative remand would be futile. *See id.; see also Miller*, 72 F.3d at 1071.

       d.    *The Plan Administrator was Correct in Finding that the Group Plan Did Not Allow a Participant to Hold Both a Group Policy and a Conversion Policy*

ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1); *see also Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988) ("Congress intended that plan documents and SPDs exclusively govern an employer's obligations under ERISA plans."); *White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 28 (4th Cir. 1997) ("ERISA demands adherence to the clear language of th[e] employee benefit plan."). MetLife, as a plan fiduciary, was bound to administer the Plan "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D).

"ERISA plans are construed according to federal common law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2001) (citation omitted). The federal common law governing ERISA "embodies common-sense canons of contract interpretation." *Loughman v. Unum Provident Corp.*, 536 F. Supp. 2d 371, 375 (S.D.N.Y. 2008) (citation omitted). Thus, courts review ERISA plans within the context of the entire agreement, "giving terms their plain meanings." *Fay*, 287 F.3d at 104, *see also U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571-72 (2d Cir. 1991).

The Second Circuit has emphasized the importance of enforcing the intention of the parties when interpreting ERISA plans. That court has held that "[t]erms in the Plan must be construed in accordance with the reasonable expectations of the insured," *Lifson v. INA Life Ins. Co.*, 333 F.3d 349, 352-53 (2d Cir. 2003), and that "[i]n construing the policy, we look to the language of the policy and other indicia of the intent of the policy's creator." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (quoting *Bradwell v. GAF Corp.*, 954 F.2d 798, 800 (2d Cir. 1992)). When the contractual language is not explicit, but the "interpreting court can discern from the contract as a whole what the parties must have intended, it should enforce

13

that intention despite a lack of express terminology." *Dobson v. Hartford Fin. Servs. Group*, 389 F.3d 386, 399 (2d Cir. 2004).

First, the plain language of the group plan does not permit participants to have both a group policy and a conversion policy at the same time. The group plan states that MetLife will issue a a conversion policy to participants if they "apply for it in writing during . . . the 31 day period after" the "date [their] Life Benefits end . . ." (Ex. A to Reinhardt Decl. at 78.) In addition, the SPD, in a section titled "Converting Your Coverage," states that participants "may convert all or part of [their] Basic Life Insurance to a [conversion] policy at rates set by MetLife *if* [their] insurance ends . . . ." (Ex. C to Reinhardt Decl. at 257 (emphasis added).) This language in the group plan and the SPD makes clear that participants were able to obtain a conversion policy "as an alternative, but not in addition to, group coverage." *White*, 114 F.3d at 29. Plan participants were entitled to obtain a conversion policy only after their group coverage had ended. Plaintiff makes no argument whatsoever in favor of interpreting the language of the group plan or the SPD to allow an individual to hold both policies.

Second, the parties intended that Mr. Dillon have one policy. The name "conversion" is itself a signal that the parties understood that Mr. Dillon was entitled to only one policy at any given time. "Conversion" connotes that something is being changed into something else, and that the new entity stands in place of the old. The application form that Parker Hannifin sent to Mrs. Dillon on October 10, 2008 was prominently titled "*Conversion* of Group Life Benefits to an Individual Policy." (Def.'s 56.1 ¶ 13; Pl's 56.1 ¶ 13; Ex. F to Reinhardt Decl. (emphasis added).) The form indicates that Mr. Dillon's benefits under the group policy—$50,000 in Basic Life and $787,000 in Optional Life, totaling $837,000—were discontinued as of September 24, 2008 due to "termination of employment." (Ex. F to Reinhardt Decl.) Under a section titled

14

"Amount(s) continued," the form states $0 in Basic Life and $0 in Optional Life. (*Id.*) Under a section titled "Amount(s) of Group Life benefits that may be converted," the form states "$50,000 Basic Life" and "$787,000 Optional Life." (*Id.*) One way or the other, Mr. Dillon wanted $837,000 in life insurance.

Although plaintiff alleges that she purchased a "second life insurance policy" in October 2008 (Compl. ¶¶ 12, 15), the evidence shows that Mrs. Dillon understood that the purpose of the application she completed was to convert her husband's group policy to an individual one. In particular, she sent an e-mail with the subject line "urgent – metlife conversion," to Parker Hannifin on October 14, 2008, one day after she had completed the group conversion application. (Def.'s 56.1 ¶ 14; Pl.'s 56.1 ¶ 14; Ex. M to Occhipinti Decl.). The email states:

> I called the number you gave me to get the *conversion* going for the life insurance. They directed me to a local [MetLife] representative who came to see us yesterday. She has informed me that the only option that is available to us is a *conversion* to a whole life policy that will cost $2382 a month in premiums. I apparently have no choice but to pay this *to keep Jack's insurance in place* . . ."

(Ex. M to Occhipinti Decl. (emphasis added).)

This email shows that Mrs. Dillon understood that she was applying to convert the group policy to an individual policy, and that the conversion policy would replace—rather than supplement—Mr. Dillon's coverage under his group policy.

It is therefore clear that MetLife's determination, though not based on substantial evidence, was substantively correct. The Plan did not allow Mr. Dillon to recover under both a group and a conversion policy. The right to hold a conversion policy was premised on the termination of the group policy, and once the group policy was reinstated, the basis for creating the conversion policy no longer existed. Because plaintiff has already fully collected pursuant to the group policy, she cannot also collect on the conversion policy.

15

D.   <u>Waiver is Not Applicable</u>

Plaintiff also argues that MetLife waived its right to deny recovery under the conversion policy by accepting one month's worth of premium payments for that policy. This argument is unavailing.

While waiver can sometimes apply in the ERISA context, it does not apply here. Courts should evaluate whether waiver applies in ERISA cases using "a case-specific analysis." *Lauder v. First UNUM Life Ins. Co.*, 284 F.3d 375 (2d Cir. 2002). The Second Circuit has held that waiver is inapplicable in cases where allowing waiver would "improperly expand the coverage of [the] policy." *Lauder*, 284 F.2d 275 at 381; *see also Juliano v. Health Maint. Org. of New Jersey Inc.*, 221 F.3d 279, 288 (2d Cir. 2000). A Second Circuit panel in *Lauder* noted that the panel in *Juliano* had looked to a state law case for guidance; that state law case held "that a claim of waiver could not be used to expand the policy so that the insured 'extend[ed] its coverage to more than it originally bargained.'" *Lauder*, 284 F.3d 375 at 381 (quoting *Albert J. Schiff Assocs. Inc. v. Flack*, 51 N.Y.2d 692, 698 (1980)). Applying waiver here would expand coverage beyond the provisions of the ERISA group plan. As discussed above, the plan does not allow participants to hold both a group policy and a conversion policy. Waiver is not available because "it would rewrite the Plan to include . . . something it clearly excludes." *Pergosky v. Life Ins. Co. of N. Am.*, No. 01-4059, 2003 U.S. Dist. LEXIS 4460, at *12-13 (E.D. Pa. Mar. 24, 2003).

Even if this argument were construed under an estoppel theory, it would still fail. "Promissory or equitable estoppel is available on ERISA claims only in extraordinary circumstances." *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 109 (2d Cir. 2008)

16

(internal quotation marks omitted).[5] To prevail on an estoppel claim under ERISA, a party must prove "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced," and must "adduce[] . . . facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well." *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 151 (2d Cir. 1999) (internal quotation marks omitted) (alterations in original).

Mrs. Dillon has not met the requirements for an estoppel claim because she has not presented any evidence that points to the existence of "extraordinary circumstances." The Second Circuit has recognized "extraordinary circumstances," without defining the term, in cases involving "intentional inducement." *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 86 (2d Cir. 2001). Such actions typically involve an employer that has promised generous benefits to an employee in an intentional effort to induce the employee to take some action—e.g., retiring early or accepting a position with the employer instead of a higher-paying competitor—and the employer later reneged on its promise. *See, e.g., Schonhoz v. Long Island Jewish Medical Center*, 87 F.3d 72, 78 (2d Cir. 1996); *Devlin*, 274 F.3d at 86-87. However, an insurer's retention of premium payments and subsequent denial of coverage based on improper enrollment does not constitute "intentional inducement," nor does it otherwise qualify as "extraordinary circumstances." *See Fershtadt v. Verizon Communs., Inc.*, No. 07 Civ 6963, 2010 U.S. Dist LEXIS 82306, at *19 (S.D.N.Y. Sept. 3, 2009); *Mooney v. Cont. Assurance Co.*, No. 02 Civ 11113, 2005 U.S. Dist. LEXIS 34937, at *13-18 (N.D.N.Y July 21, 2005); *Wallace v. Life Ins. Co. of N. Am.*, No. 93 Civ. 6056, 1997 U.S. Dist. LEXIS 9499, at *11-12 (S.D.N.Y. July 3, 1997).

---

[5] In ERISA cases, general common law principles, not state law, control. *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 85 n.5 (2d Cir. 2001).

In this action, MetLife and Parker Hannifin admittedly made a mistake in terminating Mr. Dillon's group life benefits, but they rectified that mistake within a matter of weeks by reinstating his group policy. Although MetLife had accepted one month's premium for the conversion policy while it took steps to reinstate the group policy, it returned that money to plaintiff after it realized that the conversion policy had been improperly issued. (Def.'s 56.1 ¶ 22; Pl.'s ¶ 22); *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1348 (11th Cir. 1994) ("Although [the insurer] accepted some premiums during the investigation and resolution of the problem, there is no evidence that [it] attempted to unjustly enrich itself at the expense of an ineligible plan participant."). Plaintiff has, therefore, not presented any "extraordinary circumstances" justifying a claim of estoppel.

### III.  CONCLUSION

As Mrs. Dillon has not presented evidence of any genuine dispute of material fact, and MetLife is entitled to judgment as a matter of law, defendant's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment dismissing the complaint

Dated: New York, New York
       December 28, 2011

SO ORDERED:

Sidney H. Stein, U.S.D.J.

18